# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00607-CV

**Austin Heart, P.A. and David J. Kessler, M.D., Appellants**

**v.**

**Christian L. Webb and Marilou Webb, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-06-000376, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

Austin Heart, P.A. and David J. Kessler, M.D. appeal the district court's order denying their motion to dismiss Christian and Marilou Webb's medical malpractice claims. Austin Heart and Dr. Kessler contend that the expert report served on them pursuant to civil practice and remedies code section 74.351 did not comply with the statute because it did not sufficiently identify either Austin Heart or Dr. Kessler as the parties responsible for the alleged breach of the standard of care or the cause of the alleged injury to Mr. Webb. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2005 & Supp. 2006). We agree that the plaintiffs' expert report was deficient and that the district court erred in denying the motion to dismiss. However, we are of the view that the cure provisions of section 74.351(c) are designed to allow the plaintiffs an opportunity to address and correct the defect. Consequently, we reverse the district court's order denying the motion to dismiss and remand this cause to the district court to consider whether a 30-day extension of the deadline for serving the report to allow the plaintiffs to address the deficiency is appropriate.

The Webbs sued Austin Heart and Dr. Kessler in January of 2006 alleging that Dr. Kessler failed to "diagnose and treat the medical condition which caused [Mr. Webb's] severe palpitations and resulting associated health conditions." The palpitations and other symptoms described by the Webbs were related to Mr. Webb's pacemaker. On May 31, 2006, the Webbs filed and served the expert report and curriculum vitae of Dr. Alan E. Cororve pursuant to the requirements of section 74.351 of the civil practice and remedies code setting forth Dr. Cororve's opinions regarding Mr. Webb's treatment for his problems with his pacemaker. Austin Heart and Dr. Kessler filed a motion to dismiss on June 21, 2006, claiming that Dr. Cororve's report did not identify either Dr. Kessler or Austin Heart as the parties responsible for breaching the standard of care or causing Mr. Webb injury and, therefore, the report was not a timely report as to them. In response, the Webbs claimed that the report was sufficient as written and, in the alternative, filed a motion for a 30-day extension to cure in the event the court found the report deficient.

The district court initially granted the motion to dismiss on August 22, 2006, and did not grant a 30-day extension to allow the plaintiffs to attempt to cure the deficiency. The Webbs filed a motion for rehearing and a motion for new trial on September 15, 2006, arguing that the court had misinterpreted case law relating to what constitutes a sufficient report under section 74.351 and that Dr. Cororve's report was sufficient. They also re-urged their request for a 30-day extension to cure in the event the court denied their motion for rehearing. The district court then reversed its original ruling, granted the motion for rehearing, and entered an order denying the motion to dismiss. This appeal followed.

Section 74.351 requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than the 120th day after the filing of the original

2

petition. *Id.* § 74.351(a). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l*). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (*citing American Transitional Care Ctrs, Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)).

The Texas Supreme Court has also stated that a report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Memorial*, 79 S.W.3d at 52 (*quoting Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). In addition, since the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios*, 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Bowie Memorial*, 79 S.W.3d at 53 ("The report must include the required information within its four corners."); *see also Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859

3

(Tex. App.—Houston [1st Dist.] 2006, no pet.).

We review a district court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 877-78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 42. However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

In a single issue, Austin Heart and Dr. Kessler argue that section 74.351(b) mandates dismissal of the Webbs' lawsuit. Their argument is straightforward: Read literally, without any inferences or reliance on information outside of its four corners, Dr. Cororve's report does not identify either Dr. Kessler or Austin Heart as having breached the standard of care or having caused Mr. Webb injury. The Webbs respond that, while the sections of Dr. Cororve's report relating to the breach of the standard of care and causation do not identify any specific physicians, the meaning of the report read as a whole is apparent and reveals that Dr. Cororve is referring to Mr. Webb's treatment by Dr. Kessler.

Dr. Cororve's two and one-half page report is divided into five sections—"Qualifications," "Materials Reviewed and Background," "Standard of Care," "Standard of care not met," and "Causation." In the section titled Materials Reviewed and Background, Dr. Cororve lists the various medical records he reviewed.[1] He then sets out selected portions of

---

[1] These included records of five physicians, three hospitals, and a clinic.

4

these records detailing the relevant aspects of Mr. Webb's history of treatment for atrial fibrillation and palpitations over a period of nearly four years beginning with the placement of his pacemaker in November 2001. This review of Mr. Webb's treatment history includes a number of references to Dr. Kessler's office notes, comments by Dr. Kessler in those notes, complaints by Mr. Webb contained in the notes, a reference to the office notes of a Dr. George Rodgers, an email from Mr. Webb to Dr. Kessler, a response email from Dr. Rodgers,[2] and a general statement that "[Mr. Webb] was seen by various physicians, including several electrophysiological consultations." The background section concludes with the observation that "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition."[3] The background section of the report offers no opinions regarding the appropriateness of the treatment or the responses of the physicians to Mr. Webb's complaints. It is strictly a recitation of historical material contained in the medical records reviewed by Dr. Cororve.

The report then concludes with the following three sections:

**Standard of Care**

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

---

[2] In their brief, the Webbs state that the email response was actually by Dr. Kessler rather than Dr. Rodgers and the reference in the report is a typographical error. However, there is no evidence in the record on this point other than Dr. Cororve's report.

[3] The report does not mention who was responsible for the diagnosis of diaphragmatic stimulation or placing a new right ventricular lead.

**Standard of care not met**

The diagnostic and corrective action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner.

**Causation**

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

Dr. Kessler and Austin Heart point to these sections and argue that, while they may articulate an opinion on the breach of the standard of care and on causation, the sections do not identify Dr. Kessler as breaching the standard of care or causing injury.[4] The Webbs concede that these sections do not expressly mention Dr. Kessler. They argue, however, that the background section of the report makes it clear Dr. Cororve's opinions relate to Dr. Kessler because it is primarily Dr. Kessler's actions that are noted in the relevant history.[5] Thus, they argue the report

---

[4] Austin Heart, P.A. is alleged to be vicariously liable for the conduct of Dr. Kessler. Dr. Cororve's report notes at the outset that "[a]ny reference in this report to David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A." Consequently, for the purposes of this appeal, the report must link Dr. Cororve's opinions to the actions of Dr. Kessler.

[5] The Webbs suggest that a tally of the number of times a physician is mentioned in a report is significant. They note that Dr. Kessler's name appears eleven times in Dr. Cororve's report (as opposed to three times for Dr. Rodgers and once for "various physicians"). They argue that this could lead to a reasonable conclusion that the report must be about Dr. Kessler and his actions. However, we are not persuaded that such a tally is relevant to the analysis. A physician may be named in a report any number of times simply because he was intimately involved in the treatment of a patient, yet the complaint may be with the conduct of a physician who saw the patient only once and is mentioned in the report only once. The number of times a physician is mentioned in a report, by itself, has little bearing on whether the opinions expressed in the report concern that physician. What matters, of course, is how the physician is mentioned and what the report communicates about that physician.

should be read to mean that the opinions in the standard of care and causation sections refer to the actions and conduct of Dr. Kessler set out in the background section of the report.

The problem with this argument is that it requires the reader to infer or make an educated guess that Dr. Cororve is identifying Dr. Kessler as the physician who breached the standard of care and caused injury. Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent. However, Dr. Cororve also refers to actions taken by Dr. Rodgers and makes a vague reference to Mr. Webb having been "seen by various physicians, including several electrophysiological consultations" after he was treated by Dr. Kessler but before his condition improved.[6] There is nothing *in the report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other "various physicians" referenced.

The Webbs point out that (1) Dr. Kessler is the only defendant physician and (2) the essence of Dr. Cororve's opinions is that the breach of the standard of care was the failure of the treating physicians, implicitly including Dr. Kessler, to properly adjust the ventricular pacing outputs. However, that Dr. Kessler is the only defendant physician is not relevant to an analysis of whether an expert report complies with section 74.351. The fact that he is the only defendant physician and, therefore, very likely to be the subject of the report is outside the four corners of the report. *See Palacios*, 46 S.W.3d at 878. It also does nothing to clarify to whom the opinions of the expert supplying the report apply. The expert's opinions are, of course, confined to the report and

---

[6] It is not clear what the reference to "various physicians" and "electrophysiological consultations" in the report means or is intended to communicate.

7

must tell the reader not only what conduct breached the standard of care, but whose conduct breached the standard of care. The plaintiffs' allegation that a particular physician was at fault does not substitute for the requirement that they supply an expert report demonstrating that the expert is of the same opinion.

We also do not agree that the substance of Dr. Cororve's opinions could only be associated with the conduct of Dr. Kessler. The essence of Dr. Cororve's opinion is that the physicians who treated Mr. Webb should have adjusted his ventricular pacing outputs sooner and the failure to do so was a breach of the standard of care. This opinion could apply or not apply equally to Dr. Kessler, Dr. Rodgers, or the various unnamed physicians. The report must state, in some manner, who breached the standard of care and who caused the alleged injury, and whether that includes Dr. Kessler. In the words of the supreme court in *Palacios*, "the report must inform the defendant of the specific conduct the plaintiff has called into question." *Palacios*, 46 S.W.3d at 879. This includes informing the defendant of the specific conduct in question *of that defendant*. *See Palacios*, 46 S.W.3d at 878 (The statute requires, *as to each defendant*, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between the failure and the claimed injury).

We are mindful that a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as "the standard of care was breached *by Dr. Kessler*." *See Bowie Memorial*, 79 S.W.3d at 53. However, the report must communicate in some fashion—within its four corners—how the care rendered by the physician failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). We recognize that this

8

information could be communicated in a number of ways and it could be communicated in sections of a report other than sections titled "Standard of Care" or "Causation." The form of the report and the location of the information in the report are not dispositive. However, in this case, Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb. It simply does not state that the care rendered by Dr. Kessler failed to meet applicable standards and caused injury.

While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that opinion. The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were designed to address. Since the district court ultimately found the report to be sufficient, the court did not consider whether a 30-day extension of the report deadline to allow the Webbs to attempt to cure a defect would be appropriate. In light of our ruling that the report does contain a defect, we believe consideration by the trial court of the Webbs' request for an extension to attempt to cure the defect is warranted.

Austin Heart and Dr. Kessler argue that *Garcia v. Marichalar*, 185 S.W.3d 70 (Tex. App.—San Antonio 2006, no pet.), supports the proposition that an expert report that references multiple health care providers but fails to delineate the standard of care, breach and causal connection as to specific, individual defendants is tantamount to no report at all with respect to those defendants. They then posit that since Dr. Cororve's report should be considered no report at all as

9

to Dr. Kessler, the court has no discretion but to dismiss the plaintiffs' claims with prejudice. *See Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006); *Marichalar*, 185 S.W.3d at 73-74. This overstates the holding in *Garcia*. The physician in *Garcia* was not mentioned in the report at all. There was literally nothing in the report that related to the physician in any way. Thus, the report was no report as to him. The *Garcia* court then held that this was a situation where no expert report was timely filed with respect to the physician in question, precluding the trial court from considering an extension to cure because there was no timely report to cure. 185 S.W.3d at 74 (trial court had no authority to allow a cure period for a nonexistent report).

A closer case is *Jernigan v. Langley*, 195 S.W.3d 91 (Tex. 2006). In *Jernigan*, the supreme court noted that a mere "passing reference" to a physician in a report, without explanation of how the physician breached the standard of care or caused the injury, would not constitute a sufficient report. 195 S.W.3d at 94. The only reference to Dr. Jernigan in the report was "[a]t 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered." The expert's opinion on breach of the standard of care had to do with the failure to examine certain x-rays. The report did not link Dr. Jernigan or the referenced discussion with Dr. Jernigan to a breach of the standard of care or to the failure to examine x-rays in any way. It made no other mention of him or what he did at all. The supreme court noted that the single reference to Dr. Jernigan in the report was so oblique that there was no connection at all between the reference to him and the expert's opinions regarding the standard of care and causation. It affirmed the trial court's dismissal of the lawsuit based on the insufficiency of the report, stating that "the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed." *Id.*

10

The report in *Jernigan*, as in *Garcia*, amounted to no report at all as to Dr. Jernigan and warranted dismissal for failure to serve a timely report. There was no discretion for the court to grant an extension to cure because there was no timely report—with respect to Dr. Jernigan—to cure.[7] Any attempt by the plaintiffs to "cure" the reports in *Jernigan* and *Garcia* would, in effect, have been to create and serve new reports—that did not exist at all within the time period for serving reports—with respect to the physicians in question in each case. This is conceptually no different from the situation where a plaintiff simply missed the deadline for serving a report.

*Jernigan* and *Garcia* differ from this case in crucial respects. Here, a timely report plainly discusses the conduct of the physician in question and the report discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.531. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120-day period for serving reports] because elements of the report are found deficient." Tex. Civ. Prac. &

---

[7] *Jernigan* interpreted a prior version of the statute that had a different standard for granting an extension to cure. Under the previous iteration of the statute, the trial court could grant an extension only if it found that the failure to comply with the statute was "not intentional or the result of conscious indifference but was the result of an accident or mistake." *See* former Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(g) *repealed by* Acts 2003, 78th Leg., ch. 204, § 10.09, eff. Sept. 1, 2003. The *Jernigan* opinion does not discuss the application of this standard, the trial court's failure to grant an extension under this standard, or whether the trial court could have considered such an extension if it had made such findings. Thus, the *Jernigan* opinion is distinguishable from this case on this basis alone. However, even if the trial court's discretion to dismiss claims under either version of the statute is viewed as the same, the expert report in *Jernigan* would still constitute "no report" for the purposes of dismissal under either version of the statute.

11

Rem. Code Ann. § 74.351(c). In such a circumstance, section 74.351(c) grants the trial court discretion to allow a 30-day extension of the deadline "in order to cure the deficiency." *Id. Jernigan* and *Garcia* cannot be read to mean that any deficiency in a report requires dismissal without the possibility of an extension to cure because that would mean section 74.351(c) has no possible application and is superfluous. Section 74.351(c) contemplates that there are circumstances where a timely report will be deficient, but the deficiency can be cured. To be consistent with the statute, *Jernigan* and *Garcia* must be read to allow for at least some situations where a timely report is deficient, but the trial court should consider whether the deficiency is such that it warrants allowing a cure period.[8] *Id.*

---

[8] The dissent argues that by remanding to allow the trial court to consider whether a section 74.351(c) extension is appropriate we are granting Dr. Kessler and Austin Heart more relief than they requested or are entitled to. The dissent's theory is that there is a distinction under section 74.351 between (1) seeking dismissal on the basis that no report was served and (2) seeking dismissal on the basis that a report was served, but it does not meet the requirements of the statute and is deficient. According to the dissent, if a defendant seeks dismissal only on the basis that no report was served, then dismissal is not appropriate if the court finds that a report, no matter how deficient, was served. There are two problems with this theory.

First, the dismissal mechanism of section 74.351 does not work the way the dissent suggests. Under section 74.351, a claimant must serve an "expert report," as defined in the statute, or be subject to dismissal. If a claimant does not serve a report that complies with the statutory requirements, then the claimant has not served an "expert report" as defined in the statute. Whether a claimant actually fails to serve a report at all or serves a deficient report the effect under section 74.351(b) is the same—the claimant has failed to serve the required "expert report" and dismissal is the remedy. However, section 74.351(c) provides a potential cure period for situations where the claimant has served a report, but the report does not constitute the required "expert report" because "elements of the report are found deficient." The claimant then has an opportunity to fix the defect in the report that was served. If there is a failure to cure the defect by the extended deadline, then dismissal is mandatory because the claimant has failed to serve an "expert report" as defined in the statute.

While section 74.351(b) does not distinguish between a complete failure to serve a report and the failure to serve a complying report, there is a distinction between the two for the purposes of 74.351(c). When a claimant fails to serve a report at all, section 74.351(c) does not provide a basis

12

We are of the opinion that the report in this case falls into that category. It was served timely, it makes more than a passing reference to Dr. Kessler, and it notes conduct by Dr. Kessler that could be linked to the expert's conclusions regarding the breach of the standard of care and causation. It is deficient only because it does not expressly make the link between the expert's conclusions and the referenced conduct by Dr. Kessler. If the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated

for the trial court to grant any extension of the deadline for serving a report. Consequently, dismissal is mandatory without any cure period. When a claimant serves a report, but it is deficient, section 74.351(c) gives the trial court the discretion to grant an extension to cure. Regardless of whether a claimant has failed to serve a report at all or has served a deficient report, the statutory basis of the motion to dismiss by a defendant is the same—the claimant has failed to serve an "expert report" as required by section 74.351(b). The fact that the claimant who files a deficient report may request and receive an extension of time to cure the deficiencies does not alter the nature of the defendant's motion to dismiss. The motion to dismiss is on the ground that the plaintiff has failed to serve an "expert report."

Second, the defendants in this case did request dismissal on the basis that, while the Webbs had served a report that mentioned Dr. Kessler, the report "fails to address the standard of care applicable to Dr. Kessler, the breach of the standard or any alleged causal link." This is an allegation that the report served was deficient. The defendants acknowledge that a report was served and that the report addresses conduct of Dr. Kessler, but they claim it is deficient in failing to address the statutorily required elements. They are aware that section 74.351(c) grants the trial court some discretion in allowing an extension to cure certain deficient reports. But, they argue that the report in this case is so deficient that it should be viewed as "no report," requiring dismissal rather than remand for consideration of an extension period. By alleging that the deficiency is severe enough to constitute "no report" the defendants are trying to avoid the possibility of a cure period. They are not altering their claim that the report they received is deficient and will require dismissal if not corrected.

We have concluded that the report is deficient, but not so deficient as to constitute "no report." Therefore, our options are (1) reverse the trial court order denying the motion to dismiss and render judgment of dismissal or (2) reverse the trial court order and remand for consideration of whether an extension should be granted to give the plaintiffs an opportunity to attempt to cure. Remanding for the case to proceed on its merits, even though we agree with the appellants that the report is deficient, is not an option.

conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.

We reverse the district court's order denying the motion to dismiss filed by Austin Heart, P.A. and Dr. Kessler and remand this cause for further proceedings.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop;
      Dissenting Opinion by Justice Patterson

Reversed and Remanded

Filed: May 9, 2007